UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| PATRICIA R. BLODGETT, | ) | CIV. 08-5038-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

This matter is before the court pursuant to a complaint filed by plaintiff Patricia Blodgett on April 18, 2008, appealing the denial of her application for benefits by the Social Security Administration.  See Docket 1.  Defendant, the Commissioner of the Social Security Administration, opposes Ms. Blodgett's complaint and moves the court to dismiss it in its entirety.  See Docket 5. Also pending before the court is Ms. Blodgett's motion for summary judgment, which defendant opposes.  See Dockets 7, 10.  The district court referred these matters to this magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  See Docket 11.

# PROCEDURAL HISTORY[1]

On March 14, 2005, plaintiff Patricia Blodgett protectively filed applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") with the Social Security Administration (hereinafter the "Agency") pursuant to Title II and Title XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-432. AR 104-108; 347-355. Ms. Blodgett alleged that her disability stemmed from groin pain, high blood pressure, and thyroid problems. AR 347. Ms. Blodgett's onset disability date was listed as January 1, 2004. AR 104, 351.

The Agency initially denied her applications for benefits on October 18, 2005. AR 58-61. In support of its decision, the Agency made the following determinations:

> You state that you are disabled due to groin pain, high blood pressure, and thyroid problems. There is no indication of nerve or muscle damage which would result in severe weakness or loss of function. There is no indication of joint damage which would result in severe weakness or loss of function. X-rays do not show severe damage. No severe complications have resulted due to your high blood pressure or your thyroid problems, which can be controlled by treatment. Although you may have some limitations due to your impairments, they do not severely limit your ability to perform some types of work. The reports do not show any other condition that would severely limit the ability to work. Considering medical records, age, education and work history, we have concluded that you are able to do work that does not involve heavy lifting or prolonged periods of standing and walking.

---

[1]The court shall cite to information in the administrative record by referencing "AR" followed by the appropriate page number(s).

AR 58.

Ms. Blodgett filed a request for reconsideration of the Agency's decision on December 15, 2005.[2] AR 62-63. On June 20, 2006, the Agency independently reviewed Ms. Blodgett's case and determined that the denial of her claim was proper. AR 65-66. In reaching this decision, the Agency made the following determinations:

> You state that you are disabled due to groin pain, HBP,[3] and thyroid problems. Although the restrictions of your impairment prevents you from doing your previous work, they don't exclude all types of work. There are still jobs you can perform and you are young enough to be retrained. The reports do not show any other condition that would severely limit the ability to work. Considering the medical records, age, education and work history, we have concluded that you are able to do work that doesn't require standing for long periods of time or lifting more than twenty pounds.

AR 65.

In a letter dated July 10, 2006, Ms. Blodgett indicated her desire to appeal the denial of her claims for benefits. AR 84. Ms. Blodgett alleged that she suffered from chronic severe pain, daily bi-lateral leg spasms, urinary incontinence, and depression and needed to use a cane or walker when

---

[2]Dated December 8, 2005. In this request, Ms. Blodgett stated that "My condition has not improved. I still cannot walk on my own and cannot drive or do most care taking tasks." AR 62.

[3]High blood pressure.

ambulating.[4]  Id.  On July 26, 2006, Ms. Blodgett timely filed a request for a

hearing before an administrative law judge (hereinafter "ALJ").[5]  AR 51-52.  On

July 18, 2007, an administrative hearing in this matter was held before ALJ

James W. Olson.  AR 366.  Ms. Blodgett appeared in person and by her

attorney, Larry Plank.  AR 368.  Ms. Blodgett  testified at the hearing as did

vocational expert William Tysdal and medical expert Dr. Robert Pelc.  AR 367.

On July 26, 2007, the ALJ issued a written opinion denying

Ms. Blodgett's applications for benefits.  AR 21-35.  The ALJ immediately

informed Ms. Blodgett of her right to appeal this decision to the Agency's

Appeals Council.  AR 18-20.  On September 26, 2007, Ms. Blodgett, by and

through her attorney, requested review of the ALJ's decision by the Appeals

--------

[4]The letter, prepared by a paralegal working for Ms. Blodgett's attorney,
also stated as follows:

> The Claimant's treating physician did prescribe the assistive
> devices and on 12/16/05 listed restrictions which would prevent
> Mrs. Blodgett from working at her past relevant employment.
> Since the date of the restrictions her conditions have worsened to
> the point there are no jobs she could do on any level.  She can only
> sit for a few minutes, has difficulty with getting up and down from
> seated or lying positions, standing causes severe spasm[s], lifting is
> difficult because of the assistive devices and stooping, bending,
> kneeling, crouching, [and] climbing are impossible for the
> Claimant.  She is not capable of sustained competitive employment
> and should be found disabled.

AR 84.

[5]Dated July 10, 2006.

Council.  AR 9-17.  The Appeals Council considered Ms. Blodgett's objections to the ALJ's decision.  AR 6.  On February 15, 2008, the Appeals Council denied Ms. Blodgett's request for review, finding "no reason" to review the ALJ's decision.  AR 6-8.  In light of the Appeals Council's denial of review, the ALJ's decision represents the final decision of the Agency.  AR 6.

On April 18, 2008, Ms. Blodgett timely filed a complaint against the commissioner of the Agency in the United States District Court for the District of South Dakota, Western Division.  See Docket 1.  Ms. Blodgett appeals the ALJ's decision denying DIB and SSI benefits.  Id.  Ms. Blodgett moves the court to reverse the decision of the ALJ and find that she is entitled to benefits or, in the alternative, to remand the case to the Agency for further consideration.  Id.  Ms. Blodgett also moves the court for an award of attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.  Id.  On August 4, 2008, Ms. Blodgett filed a motion for summary judgment setting forth her objections to the ALJ's decision.  See Dockets 7 & 8.  On March 18, 2009, the district court referred Ms. Blodgett's case to this magistrate judge for a report and recommendation.  See Docket 11.

**MEDICAL EVIDENCE**

**A.    Treatment Records**

**1.    Records from Indian Health Services**

Records from Indian Health Services ("IHS") for Ms. Blodgett cover a period from June 2003 to January 2006.[6]  AR 261-300.  As of November 13, 2004, Ms. Blodgett's treating physician at IHS was Dr. Lorelee Stock.  AR 262-263.  It appears that Ms. Blodgett first complained of hip and/or groin pain on September 4, 2003.  AR 298.  She described a sharp pain in her left hip when standing up and rolling over in bed.  Id.  Ms. Blodgett continued to complain of pain on her September 8, 2003, and October 7, 2003, visits.  AR 297, 296.  During her January 26, 2004, visit, Ms. Blodgett indicated that she would like to use a cane.  AR 294.  On June 28, 2004, Ms. Blodgett requested to be referred to a specialist.  AR 291.  She complained that her groin pain had worsened since January of 2004, but Darvocet helped with the pain.  Id.  Steroid injections and chiropractic care also helped for a short time.  Id.  Ms. Blodgett again complained of groin pain on July 19, 2004, stating that she had difficulty walking.  AR 290.  During her August 17, 2004, visit for bilateral groin pain, Ms. Blodgett indicated that the pain was most severe when first standing up, but was manageable a few minutes thereafter.  AR 289.

---

[6]Most of these records are almost completely illegible.

On August 18, 2004, it was noted that Ms. Blodgett had been seen by an orthopedic surgeon who opined that Ms. Blodgett has a soft tissue injury and recommended physical therapy and pain control.  AR 288.  Ms. Blodgett indicated that she experienced difficulty ambulating, with the pain at its worse when standing erect.  Id.  The doctor recommended weight loss, stretching exercises, and continued medication use.  Id.

On September 16, 2004, Ms. Blodgett had a physical therapy session.  AR 286, 287.  It was noted that Ms. Blodgett still had not begun her exercise program.  AR 286.  The doctor recommended weight loss and stretching exercises.  Id.  Ms. Blodgett had another physical therapy session on September 30, 2004.  AR 285.

Dr. Stock first saw Ms. Blodgett on November 13, 2004.  AR 284.  During that visit, Dr. Stock reviewed Ms. Blodgett's symptoms and the results from prior tests.  Id.  Dr. Stock saw Ms. Blodgett again on November 22, 2004, and noted that Ms. Blodgett was walking better.  AR 283.  Ms. Blodgett complained of pain upon standing up from a seated position.  Id.  On December 7, 2004, Dr. Stock noted that Ms. Blodgett was a little stronger, although she still ambulated slowly.  AR 282.  On December 21, 2004, Dr. Stock discussed with Ms. Blodgett, over the telephone, possible side effects of medication.  AR 281.

On January 7, 2005, Ms. Blodgett informed Dr. Stock that she had fallen a week prior, but, prior to the accident, had been "doing better" when

exercising.  AR 280.  Dr. Stock referred Ms. Blodgett to another doctor and recommended a muscle biopsy.  Id.  On January 9, Dr. Stock authorized a prescription refill for Zoloft to treat Ms. Blodgett's depression.  AR 279.  On January 11, 2005, Ms. Blodgett was seen by a mental health specialist.  AR 278.  Ms. Blodgett stated that the depression medication Zoloft appeared to be working and her mood was stable, with decreased crying spells.  Id.

On January 31, 2005, Dr. Stock indicated that Ms. Blodgett's MRI should be sent to another doctor for review.  AR 277.  Per Dr. Stock's order, a CT[7] scan of Ms. Blodgett's pelvis[8] was taken on February 9, 2005, at the Rapid City Regional Hospital.  AR 243.  The scan showed no specific abnormality of either hip joint, no free fluid or abdominal fluid collection in the pelvis, no dilation of the ureter, and no evidence of a hernia.  Id.  The scan did not identify any specific abnormality other than what appeared to be a horseshoe kidney.  Id.

On February 15, 2005, Dr. Stock and Ms. Blodgett discussed the results from the CT scan.  AR 276.  On March 10, 2005, Ms. Blodgett complained of hip pain.  AR 275.  Dr. Stock recommended an MRI[9] scan of Ms. Blodgett's brain.  Id.  On April 7, 2005, Ms. Blodgett complained of hip pain and

---

[7]Computerized Tomography Scan.

[8]The CT scan was done with intravenous, or I.V., contrast.  AR 243.

[9]Magnetic Resonance Imaging.

weakness in her legs. AR 273. Dr. Stock again recommended an MRI scan of her brain. Id.

Per Dr. Stock's order, an MRI scan of Ms. Blodgett's brain[10] was taken on April 20, 2005, at the Rapid City Regional Hospital. AR 241. The results of the scan were negative, showing no abnormalities. Id.

Ms. Blodgett saw Dr. Stock on May 9, 2005, reporting increased strength and fewer crying spells, and again on July 1, 2005, reporting decreased strength in her left arm. AR 271, 272. Dr. Stock referred Ms. Blodgett to another doctor for a consultation. AR 271. On July 29, 2005, Ms. Blodgett first reported symptoms of urinary incontinence. AR 270. Dr. Stock referred her for a neurological consultation. AR 270. On September 2, 2005, Ms. Blodgett indicated that her symptoms were unchanged except that she had sprained her right ankle. AR 268. On September 28, 2005, Ms. Blodgett was seen by a mental health specialist. AR 267. Ms. Blodgett reported that Zoloft was no longer effective and that she felt worthless, helpless, and hopeless. Id. She reported that her family was not sympathetic. Id. The doctor prescribed Wellbutrin. Id. On October 19, 2005, Ms. Blodgett saw Dr. Stock and indicated that her physical condition was unchanged. AR 266. On December 1, 2005, Ms. Blodgett saw a mental health specialist for a refill of the medication used to treat her depression. AR 265. Ms. Blodgett reported no

---

[10]The MRI scan was done with and without contrast. AR 241.

problems or side effects.  Id.  On December 13, 2005, Ms. Blodgett reported "doing fine" on her depression medication.  AR 264.

The record shows that Ms. Blodgett's next visit with Dr. Stock was not until June 5, 2006.  AR 322.  Ms. Blodgett stated that she was "doing better." Id.  Ms. Blodgett saw a mental health specialist in July of 2006.  AR 320. Ms. Blodgett reported tolerating her medication.  Id.  She stated that her mood, appetite, and sleep were good.  Id.  She asked to be taken off the anti-depressant medication, but then decided to continue treatment upon the advice of her doctor.  Id.

Ms. Blodgett saw Dr. Stock again on November 3, 2006.  AR 319. Ms. Blodgett indicated that she was doing "fairly well" except for night spasms that had increased over the past month.  Id.  Ms. Blodgett visited Dr. Stock again on December 4, 2006, for pain management.  AR 318.  There are no records to indicate that Dr. Stock saw Ms. Blodgett for the year 2007.  The last record from IHS is from June 11, 2007, when Ms. Blodgett received a steroid injection.  AR 306-310.

### 2. Records from Rapid City Regional Hospital

On January 6, 2004, Ms. Blodgett went to the Rapid City Regional Hospital's emergency room complaining of "pain in the left hip with activity and range of motion."  AR 188.  Ms. Blodgett stated that the pain had been present for the past year, worsening when she had a child seven months prior.  Id.

Ms. Blodgett denied any fever, abdominal pain, weakness, or numbness.  Id.

The emergency room doctor, Dr. James Gilbert, noted that Ms. Blodgett did not

appear in acute pain and that an x-ray of her hip revealed no bony

abnormalities.  Id.  The x-ray, which provided an AP and lateral view of

Ms. Blodgett's left hip, revealed that the bones and soft tissue appeared normal

and there was no evidence of fracture, significant arthritic change, or foreign

body.  AR 190.  Upon completing a physical examination of Ms. Blodgett,

Dr. Gilbert found as follows:

> The left hip is tender to palpation and range of motion.  Knee and
> ankle are nontender.  Distal neurovascular and motor intact.  No
> significant bony tenderness.  Diffuse tenderness to the hip is noted
> on palpation and range of motion.  Overall she has reasonably
> good range of motion.

AR 188.

Dr. Gilbert's assessment was that Ms. Blodgett's hip pain "felt secondary some

bursitis or overuse."  AR 189.  He prescribed Naprosyn and Darvocet for pain

and encouraged Ms. Blodgett to follow-up with an orthopedic doctor.  Id.

Treatment notes from January 15, 2004, by Dr. David Boyer included

the following observations:

> She is significantly overweight, at least 40 to 50 pounds.  Her back
> examination is negative.  She can heel walk and toe walk.  Knee
> jerks and ankle jerks are okay.  The main finding here is that with
> rotation of her hips she has significant pain and it is with both
> passive and active motion in her hip.  There is no specific point
> tenderness around her hip that she elucidates.  She walks with an
> abductor lurch....

> X-rays were reviewed from the emergency room taken January 6, 2004, including AP of the pelvis and Lowenstein lateral views. These do not clearly show an abnormality. There is a small question of a stress fracture in the left hip and may be some mild degenerative arthritis, but really not to speak of.

AR 193.

Being uncertain of the cause of Ms. Blodgett's left hip pain, Dr. Boyer recommended an MRI scan. Id.

On January 15, 2004, a high field MRI scan of Ms. Blodgett's pelvis was done. AR 197. The MRI scan revealed that "[t]he signal within the hips and pelvis was normal. No evidence of any fluid in either hip joint. Pelvic structures appear normal." Id. The scan showed Ms. Blodgett's pelvis and hip to be normal. Id.

On January 20, 2004, Dr. Boyer noted that Ms. Blodgett did not have specific groin tenderness, but raising her leg and rotating her hip caused pain. AR 192. Dr. Boyer noted that a CT scan of her hips and pelvis was normal and that x-rays of her pelvis revealed no abnormalities. Id. Ms. Blodgett had a "very small 3mm cyst in the calcar on the left," which the MRI scan "did not pick this up as being abnormal." Id. Dr. Boyer recommended a bone scan and possible injection of the hip joint or the iliopsoas bursa and prescribed Darvocet for the pain. Id. Dr. Boyer also determined that Ms. Blodgett should use crutches with partial weight bearing and that Ms. Blodgett should not continue working, at least temporarily, as her job required a lot of walking. Id.

A total body bone scan was performed on January 21, 2004.  AR 195.

The bone scan revealed the following:

> There is very mild asymmetric increased activity involving the right
> inferior sacroiliac joint.  The remaining uptake within the pelvis
> including the hip regions is normal.
>
> [unreadable] uptake within the spine is normal.  No significant
> abnormal activity is identified in the long bones.  There is some
> activity noted within the feet bilaterally, right side more than left,
> which could be from posttraumatic or arthritic uptake....
>
> 1.    Very mild increased activity involving the right inferior
>       sacroiliac joint when compared to the left.  This is the
>       opposite side as the patient's symptoms.
>
> 2.    Some uptake noted in the feet bilaterally which could be
>       either traumatic or arthritic in nature.
>
> 3.    Otherwise, normal bone scan.

Id.

On January 27, 2004, Dr. Boyer noted that Ms. Blodgett's bone scan was
normal.  AR 191.  Ms. Blodgett continued to complain of pain in her left hip
which caused her to be "pretty much on crutches."  Id.  Dr. Boyer noted that
he had not been able to specifically diagnose the problem, but a possibility was
that "this was soft tissue pain from either the labrum of the hip joint and
possibly from the joint itself, or the iliopsoas bursa."  Id.  Dr. Boyer
recommended that Ms. Blodgett see Dr. Brett Lawlor for evaluation and
treatment, including possible soft tissue injections either in the hip or iliopsoas
bursa.  Id.

**3.  Records from The Rehab Doctors**

Upon referral from Dr. Boyer, Ms. Blodgett began seeing Dr. Brett Lawlor

of The Rehab Doctors[11] on February 9, 2004.  AR 211-13.  Ms. Blodgett

complained of "shocking, stabbing pain" most notable when standing up or

shifting positions while seated.  AR 211.  Because Ms. Blodgett favored her left

leg, she was beginning to experience discomfort in her right hip and lower

back.  Id.  Her right toes ached.  Id.  She rated her pain as a "0/10 at present,

a 10/10 at its worst, and a 0/10 at its best."  Id.  Her pain was worse when

standing up and upon awakening each morning, but she "loosen[ed] up" after a

few minutes.  Id.  Ms. Blodgett reported that Darvocet and hot showers

provided some relief as did ice and bed rest.  Id.  Keeping her legs still also

provided some relief.  Id.  Sitting and lying down relieved her pain.  Id.  Use of

crutches decreased her pain, but as soon as she bore any weight, the pain

returned.  Id.  Walking and standing increased her pain.  Id.  Massages,

aerobics, and gravity inversion worsened her pain.  Id.  Hot packs,

strengthening exercises, anti-inflammatory medication, and muscle relaxants

had no effect.  Id.  Bending forward, bending backward, and lifting resulted in

no changes to her pain.  Id.  Ms. Blodgett identified her pain as 25% back pain

---

[11]During some visits to The Rehab Doctors, Ms. Blodgett was seen by
Dr. Lawlor's assistant, Crystal L. Walton, PA-C.  To avoid unnecessary
confusion, the court recounts these visits as if Ms. Blodgett had been seen by
Dr. Lawlor.

and 75% leg pain.  Id.  Ms. Blodgett indicated that she could no longer walk, turn, or lift because of the pain and that she occasionally needed to sit or lie down to control her pain.  AR 212.

Dr. Lawlor noted that Ms. Blodgett's gait was guarded, favoring the left lower extremity, and that she arose from a seated position rather guardedly. Id.  Ms. Blodgett was in no acute distress at the time of the examination and was able to do heel and toes raises and a full squat.  Id.  Lowering the left lower extremity produced left groin pain, and a left reverse straight leg raise produced a pulling sensation in the left groin.  AR 213.  Ms. Blodgett was tender to palpation over the L5 spinous process, but she did not experience pain in the bilateral iliopsoas or SI joints during palpation.  Id.  Dr. Lawlor made the following diagnoses and recommendations:

> I agree with Dr. Boyer that this has components of a iliopsoas bursitis.  I think, also, there is a possible SI joint/pelvic dysfunction that is contributing to her symptoms.  It is difficult to tell clinically.  She does not have tenderness to palpation in the iliopsoas region; however, activation of these muscles does reproduce some of her pain.  She also has considerable pain with weight bearing which would go along with SI joint/pelvic dysfunction.
>
> I am going to have her see Laura Bonsness for ultrasound, SI joint and pubic symphysis mobilization, stretching of the iliopsoas muscle and ultrasound in this area as well.

Id.

Dr. Lawlor saw Ms. Blodgett again on March 8, 2004, for a follow-up visit.  AR 210.  He noted that Ms. Blodgett had been participating in physical

therapy at the Black Hills Orthopedics.  Id.  Ms. Blodgett reported that her pain was unchanged.  Id.  In a seated position, Ms. Blodgett rated her pain as 0/10, arising from a seated position increased her pain to 8/10, yet her pain resolved when ambulating.  Id.  Although Ms. Blodgett used a cane on an as-needed basis, she believed that she could ambulate further and tolerate her exercises better since undergoing physical therapy.  Id.  The ultrasound treatment to her left groin helped relieve her pain for several hours.  Id.  Dr. Lawlor noted that Ms. Blodgett arose from a seated position rather slowly, was mildly antalgic, favored the left lower extremity, and had mildly decreased flexion in her lumbar spine, although she was not tender to palpation over the lumber spine or SI joints.  Id.  Dr. Lawlor recommended that Ms. Blodgett continue with her physical therapy, particularly with ultrasound treatment, and receive a trigger point injection of the left iliopsoas bursa.  Id.  Ms. Blodgett received the injection on March 9, 2004.  AR 209.

Dr. Lawlor saw Ms. Blodgett again on March 23, 2004, for a follow-up visit.  AR 207-208.  Ms. Blodgett reported that she experienced no relief from the injection and did not find the ultrasound treatment to be beneficial. AR 207.  She had considerable difficulty arising from a seated position and changing positions and moved slowly and guardedly.  Id.  Dr. Lawlor advised Ms. Blodgett to discontinue physical therapy, as it did not seem to provide relief.  AR 208.  He also recommended a lumbar spine MRI scan.  Id.

Ms. Blodgett requested to return to work for three hours a day as a cook, stating that she felt able to do the work as long as she remained in a standing position. Id. Dr. Lawlor provided a prescription to return to work. Id.

An MRI scan of Ms. Blodgett's lumbar spine was taken on April 1, 2004. AR 206. The scan revealed the following:

> At L5-S1, there is degenerative disc disease with some mild bony reactive change of opposing endplates. There is a small left central disc protrusion, which appears to be subligamentous herniation. This impresses on the anterior aspect of the thecal sac minimally and it does deviate the traversing left S1 nerve root minimally. It does not appear to be impinging on that nerve root. There is mild facet degenerative disease.

Id.

The scan revealed no abnormality that accounted for Ms. Blodgett's groin pain. Id. The small disc herniation at L5-S1 definitely did not impinge on her nerve roots. Id.

Ms. Blodgett's next visit was on April 6, 2004. AR 203. Dr. Lawlor recommended that she receive an epidural steroid injection as conservative treatment methods had failed. Id. Ms. Blodgett was diagnosed with bilateral groin pain, DDD[12] of the lumbar spine, and DJD[13] of the lumbar spine. Id. Ms. Blodgett indicated that she was "tolerating" her limited work hours. Id. Ms. Blodgett received the steroid injection on April 19, 2004. AR 204.

---

[12]The court assumes that "DDD" refers to degenerative disc disease.

[13]The court assumes that "DJD" refers to degenerative joint disease.

Ms. Blodgett's next visit was on May 3, 2004.  AR 202.  Following the injection, Ms. Blodgett reported experiencing a 50% improvement, with her pain being completely absent for three to four days.  Id.  The pain returned, however, and Ms. Blodgett continued to have pain when standing and walking.  Id.  She reported experiencing no pain when sitting.  Id.  Her pain was most acute when arising from a seated position or when flexing either hip.  Id.  During the visit, Ms. Blodgett was using a cane to ambulate.  Id.  It was recommended that she continue receiving the caudal epidural injections and begin taking Celebrex and Tylenol Extra Strength.  Id.  Ms. Blodgett received a right and left SI joint injection on May 5, 2004.  AR 200.

Ms. Blodgett's last visit with Dr. Lawlor was on May 19, 2004.  AR 199.  Ms. Blodgett reported only a 20% improvement following the injection.  Id.  She stated that her left leg seemed weaker than before, although she indicated that she had been jumping on a trampoline to strengthen her lower extremities.  Id.  She reported no increase in pain as a result of this type of exercise.  Id.  Dr. Lawlor recommended that Ms. Blodgett undergo a gynecological evaluation and a diagnostic/therapeutic left hip joint injection.  Id.  It is unclear whether Ms. Blodgett followed these recommendations as there are no records indicating that Ms. Blogett underwent a gynecological examination or a joint injection after the May 19, 2004, visit with Dr. Lawlor.  The only injection

received by Ms. Blodgett after this visit occurred on June 11, 2007, and this was a steroid injection.  See AR 306-310 .

### 4.    Other Records

On August 17, 2004, Ms. Blodgett was seen by Dr. Jeffrey Marrs, an orthopedic surgeon at the Black Hills Orthopedic and Spine Center.  AR 214-215.  Ms. Blodgett complained of bilateral groin pain that was greater in her left groin area.  AR 214.  Ms. Blodgett first experienced groin pain two years earlier when she fell.  Id.  The pain disappeared after about a week.  Id.  However, the pain in her groin reappeared after she had a child, and she had experienced steady pain during the past eight months.  Id.  She stated that the pain was manageable when "she's up and around," although the pain never completely disappeared.  Id.  She further stated that she could work for two hours at a time as a cook.  Id.  Chiropractic care seemed to have "some benefit."  Id.  Dr. Marrs noted that Ms. Blodgett had "apparent antalgia upon arriving and difficulty first moving around."  Id.  Ms. Blodgett "had bilateral hip range of motion from 0-90 degrees, internal 15, external 45, abduction at 30 none of which caused any pain."  Id.  Dr. Marrs made the following observations and recommendations:

> Bilateral groin pain.  I think she may be correct that this is
> somehow related to pelvic stretch from her injury and/or
> pregnancy.  I don't see anything of great concern of the hips if her
> report of the MRI and bone scans is accurate then it's unlikely that
> it's anything serious going on.  I recommend that she continue

with chiropractic and non-steroidal anti-inflammatories and begin physical therapy....

AR 215.

On December 29, 2004, Ms. Blodgett was seen at the Black Hills Health and Wellness Center of Rapid City, a chiropractic care facility. AR 217-222. Ms. Blodgett was in a wheelchair and was unable to get up or ambulate without assistance. AR 217. Ms. Blodgett complained of constant, severe pain in the left and right sacroiliac area and constant, moderately severe weakness in the left and right leg. Id. Ms. Blodgett stated that she had fallen the day prior. AR 220. Ms. Blodgett also stated that walking forward and any jarring motion caused severe pain and that raising and lowering her right arm caused pain. Id. In terms of range of motion, with 25 being a normal degree of lumbar flexion, Ms. Blodgett's lumbar extension was a zero, lumbar left lateral flexion was a five, and lumbar right lateral flexion was a five. AR 217. Ms. Blodgett was determined to be "in an acute phase" and was referred for a neurological examination. Id.

On January 4, 2005, Ms. Blodgett was seen by Dr. Marius Maxwell of The Spine Center at Rapid City for a neurological consultation and examination at the request of Dr. Gregory Scherr, a chiropractor at the Black Hills Health and Wellness Center. AR 229-234. Dr. Maxwell noted the following:

> Patricia is a 38 year old female patient who...experienced a fall in which she did do the splits two years ago....She has a long-standing history of lower back pain, which has been treated fairly

successfully with chiropractics in the past. However, on 12/30/04 the patient again sustained a fall due to sharp pain extending into the groin bilaterally. She reports this as an intermittent shooting and piercing type pain. She denies any parethesias. She states that she is weak, however on further history she states that her legs would give away due to the pain. She denies any numbness or hyperesthesias. She states that she has some urinary urgency, but denies any incontinence of her bowel or bladder.

She states that acts of standing, bending, and twisting all provoke her pain. She has had coddle injections by Dr. Lawlor and this has left her unchanged. She states that she has some difficulty at night because of this. She was working up until 12/30/04 as a cook for Primrose Assistance Living Center. She has had a formal course of physical therapy at Black Hills Orthopedics and this has left her lower back pain unchanged.

She denies any surgery of the head, neck, or back. She states that overall her condition has markedly worsened and she has had to use a walker for the last several days.

AR 230.

Dr. Maxwell noted that, at the time of the examination, Ms. Blodgett was in mild to moderate discomfort, but did not appear to be acutely distressed. AR 231. Her abdomen was non-tender to palpation and no masses were found. Id. Dr. Maxwell observed that Ms. Blodgett moved about "exceedingly slowly" with "large grimace and vocal commentary to movement." Id. It took Ms. Blodgett approximately eight minutes to move from her chair to the exam table. Id. Palpation of the cervical and thoracic spine revealed no tenderness or obvious deformities. AR 232. However, palpation of the lumbar spine revealed tenderness, but no obvious deformity. Id. Dr. Maxwell was unable to perform a test of that area due to Ms. Blodgett's "excessive and extreme report

of pain." Id. Range of motion of the bilateral hips caused Ms. Blodgett significant pain, causing her to cry out during the examination. AR 233. Dr. Maxwell noted decreased SLR[14] bilaterally and paraspinal muscle spasm bilaterally. AR 229. Ms. Blodgett was able to ambulate on her toes and heels without difficulty, and tandem walking was normal. AR 234. When in a seated position, Ms. Blodgett experienced "severe and intense" groin pain when extending at the knee, causing Ms. Blodgett to become tearful. Id. Dr. Maxwell diagnosed Ms. Blodgett with L5-SI degenerative disc protrusion. Id. In order to rule out the presence of a hernia, Dr. Maxwell referred Ms. Blodgett to Dr. Edward Picardi. Id. Dr. Maxwell also ordered an MRI scan of Ms. Blodgett's lumbar spine. AR 229.

An MRI scan of Ms. Blodgett's lumbar spine was taken on January 5, 2005. AR 227-228. The MRI scan revealed the following:

> At L5-S1 there is chronic degenerative disk disease with some chronic appearing bony reactive change in both endplates. There is central disk protrusion which does appear to be subligamentous herniation. This disk protrusion contacts the anterior aspect of the thecal sac but does not impinge on individual nerve roots.

AR 227.

On January 18, 2005, Ms. Blodgett was seen by Dr. Maxwell for a follow-up visit. AR 225. Ms. Blodgett complained of continuing left inguinal pain resulting in difficulty in walking and severe spasms at night. Id. Dr. Maxwell

---

[14]Straight leg raising.

reviewed the MRI scan, noting that it showed degenerative disc protrusion at L5-S1 which seemed to be chronic. Id. He diagnosed Ms. Blodgett with L5-S1 chronic degenerative disc protrusion and recommended provocative discography and CT scanning. Id. Dr. Maxwell referred Ms. Blodgett to Dr. Picardi to rule out left inguinal hernia and prescribed Valium and Flexeril for the pain. Id.

On January 21, 2005, upon referral from Dr. Maxwell, Ms. Blodgett was seen by Dr. Edward Picardi, general surgeon. AR 236-238. Ms. Blodgett complained of worsening pain and the appearance of a lump or bulge in the crease below the inguinal canal. AR 237. During the examination, Dr. Picardi noted that Ms. Blodgett walked with a "very slow and widened gait with a cane." Id. He also noted that Ms. Blodgett's pain was not associated with any heavy activity. Id. Ms. Blodgett complained of pain centered at the crease of her pannus, but Dr. Picardi found it difficult to identify where her pain stemmed from. Id. Finding no evidence of an inguinal hernia, Dr. Picardi opined that her pain may have been consistent with a femoral hernia as the pain seemed to be "right anterior, right over the femoral canal." AR 238. Dr. Picardi noted a soft bulge or muscle spasm in that area. AR 236.

On February 14, 2006, upon referral from Dr. Stock, Ms. Blodgett was seen by Dr. Robert MacLachlan of Neurology Associates for a neurology

consultation.  AR 302-305.  Dr. MacLachlan provided the following overview of

Ms. Blodgett's history:

> The patient is a 39 y.o. woman who has experienced bilateral groin
> pain since 2001.  This first occurred in the left groin, which
> resolved and recurred 6 months postpartum.  The pain is
> described as a sharp jabbing sensation which is precipitated when
> extending her left leg forward or when sitting or standing.  The
> pain alternates from side to side, currently affecting the left side.
> The patient denies any numbness or tingling in the legs and has
> had no pins-and-needles tingling sensations in the feet.  The
> patient denies any back pain.  She does describe some stiffness in
> her left groin after sitting.  The patient was evaluated for pain
> complaints by Dr. Lawlor who gave the patient lower lumbar and
> left groin injections which were of no symptom added benefit.  The
> patient has been treating her pain with Darvon p.r.n. she gained
> 40 pounds following the birth of her child, which she attributes to
> inactivity from her pain.  The patient has been using Canadian
> crutches which were not prescribed, but were given by a friend, for
> which she refers to as balance problems.  The patient has also had
> complaints of bladder urgency and frequency.  The patient has
> been evaluated by a chiropractor, who applied pressure left region
> and was able to find an area of tenderness which provoked the
> patient's groin pain.  The patient, up to four months ago was
> treated with Neurontin.  She is not certain of this is of
> symptomatic benefit.  The patient was evaluated by Dr. Maxwell,
> neurosurgeon.  An MRI scan of the lumbosacral spine
> demonstrated a degenerative disc at L5-S1 without evidence of
> central canal or neural foraminal compromise.  She was then
> referred to Dr. Edward Picardi, general surgeon.  She had an MRI
> scan of her left hip and groin, which was read as normal.

AR 302.

After performing a neurological examination, Dr. MacLachlan found the

results to be unremarkable.  AR 305.  He noted that Ms. Blodgett's gait was

very slow and "dramatically cautious" and that her "pain may be neuropathic

in origin, stemming from perhaps a femoral branch of the genitofemoral nerve, a cutaneous sensory nerve." Id. Dr. MacLachlan recommended that Ms. Blodgett reinitiate use of Neurontin and visit a chronic pain specialist at the Rapid City Regional Hospital. Id.

**B.    Opinion Evidence**

**1.    Function Reports**

On April 14, 2005, Craig Blodgett completed a function report describing how his wife's medical condition limited her daily activities. AR 118-125. Craig Blodgett stated that he went to work early in the morning and then returned home to help his wife ready their daughter for school, dress their son, and do chores. AR 118. He also helped Ms. Blodgett don her shoes and bra and get in and out of the shower. AR 119. Ms. Blodgett was able to prepare meals and care for their son alone during the daytime. AR 120. She was able to do light housekeeping (e.g., wiping counters and stove top and washing dishes). Id. Mr. Blodgett returned home from work at approximately 3:30 p.m. AR 118. Mr. Blodgett generally made dinner. AR 125.

Ms. Blodgett was able to drive and went shopping about once a week. AR 121. She was able to go out alone. Id. However, activities like walking and bike riding had completely ceased due to her condition. AR 122. In terms of social activities, Ms. Blodgett's mother and sister visited about once a week. Id. Mr. Blodgett stated that his wife could walk less than 50 feet before

25

needing to stop and rest, needed to rest for one to two minutes before resuming walking, and could lift a maximum of 10-15 pounds. AR 123. Mr. Blodgett stated that his wife needed to use an assistive device when ambulating. AR 124. He stated that Mrs. Blodgett was able "to take care of the very basic needs of [their] family," but could not "perform many of the tasks that this requires."[15] AR 125.

---

[15]On July 2, 2007, Mr. Blodgett wrote a letter to his wife's attorney describing his wife's typical day as follows:

> Around five a.m. I wake Patricia and my daughter (Elaine) so she may prepare for school. I assist Patricia to the bathroom, (she is very stiff and needs help after sleeping) I then get Elaine's breakfast ready.
>
> I return from work to take Elaine to school, then back home to help Patricia and my son Joshua get dressed for the day.
>
> Patricia does the best that she can to wash the dishes from breakfast.
>
> She usually is in the bathroom again between eight-thirty and nine a.m. These bathroom visits on the average last between 20-30 minutes for multiple reasons. She has difficulty on and off the toilet, and emptying her bladder. There are at least four such bathroom visits in a course of an eight hour day....
>
> Patricia will prepare lunch. After lunch she will rest on the couch, and along with our son she will sleep one and a half to two hours. During school months, Patricia will try to have a snack ready for our daughter around three in the afternoon. I usually arrive shortly after four o'clock. At that time Patricia is on the couch sometimes with an ice pack, heating pad, or she may be in the bathroom. Then I will cook supper.

AR 149-150.

On April 14, 2005, Ms. Blodgett also completed a function report describing how her medical condition limited her daily activities. AR 126-134. Ms. Blodgett described her daily routine as follows:

> I wake up, take 2 darvocet (for pain), wake 11 yr. old daughter up for school go to the bathroom, fix breakfast for daughter, Take rest of the meds, help daughter w/hair, fix son (22 mo.) breakfast, spend 15 min. or so stretching legs, watch tv & play w/son, put son down for nap, leg exercises (can't do them while he's up!) try to do as much as I can picking up around the house. Fix after school snack for daughter also fix lunch for son. Help w/homework, watch tv, stretch legs, fix supper (some of the time) visit with family, get kids ready for bed, take Darvocet, Go to bed.

AR 126.

Ms. Blodgett stated that she required assistance putting on her pants, shoes, and socks and getting in and out of the shower. AR 127. She could not turn over in bed or sleep in one spot without pain. Id. She was able to care for her hair, shave, use the toilet, and feed herself without aid. Id. She was able to perform light housekeeping tasks such as washing dishes, cleaning the toilet and sink, dusting, and picking up toys from the floor. AR 128. Her husband assisted in some housekeeping chores and did all of the yard work. Id. Ms. Blodgett stated that she could not go out alone because she could not carry her son to and from her vehicle. AR 129. She goes shopping with her husband once a week. Id. In terms of hobbies, Ms. Blodgett read, did bead work, and decorated cakes. AR 130. She no longer went for walks or bike rides. Id. She stated that she could not do any task or activity that required

"leg work." AR 131. She could walk for about 20-30 steps before needing to stop and rest, could resume walking after a minute or two of rest, and could not lift her son (30 pounds).[16] Id. Ms. Blodgett indicated that she experienced slight depression. AR 132. She also indicated that she needed to use a walker when ambulating inside her home and a crutches when ambulating outside her home. Id. The crutches were prescribed to her. Id.

**2.    Disability Report**

On December 8, 2005, Ms. Blodgett completed a disability report describing how her condition had changed since filing for benefits. AR 135-142. Ms. Blodgett stated that she had since suffered depression, which was treated by counseling and medication. AR 135. She also stated the she suffered from pain, weakness, and fatigue in her left leg and groin and severe incontinence. AR 141. Her incontinence embarrassed her. AR 142. She noted that she had fallen because her left leg gave way, causing a sprain in her right ankle. AR 141. Ms. Blodgett also experienced severely painful spasms particularly in the mornings. Id. She was unable to walk unaided or stand for long periods of time. Id. She required assistance to dress, shower, and shampoo her hair. AR 142. She could only sit for approximately 30 minutes at one time. Id. She stated she was unable to do simple household tasks such as

---

[16]Ms. Blodgett actually wrote, "I can lift my son–30 pounds." AR 131. The court assumes, as did the ALJ, that Ms. Blodgett actually meant that she could not lift her son.

laundry or vacuuming.  Id.  Her medications caused her to become sleepy

during the day and experience insomnia during the night.  Id.

### 3.    Physical Residual Functional Capacity Assessments

On October 14, 2005, Dr. Kevin Whittle, a medical consultant for the

Agency, completed a physical residual functional capacity assessment ("PRFC")

to assess Ms. Blodgett's then-current residual functional capacities.

AR 156-164.  Dr. Whittle noted that Ms. Blodgett's primary diagnosis was of

groin pain and secondary diagnosis of obesity.  AR 156.  After considering all of

the evidence in Ms. Blodgett's file, Dr. Whittle determined that Ms. Blodgett

had the following exertional limitations: occasionally lift and/or carry

(including upward pulling) up to 20 pounds; frequently lift and/or carry

(including upward pulling) up to 10 pounds; stand and/or walk (with normal

breaks) for a total of at least two hours in an eight-hour workday; sit (with

normal breaks) for a total of about six hours in an eight-hour workday; and

unlimited ability to push and/or pull (including operation of hand and/or foot

controls).  AR 157.  Dr. Whittle based his conclusions on the following facts:

> 38 year old female with chronic groin pain related to an injury.
> Exact etiology not clear despite extensive diagnostic evaluation.
> Exam shows obesity and pain with ROM in hips.  No neurologic
> deficits.  Bone scan showed some uptake in left SI joint.  SI joint
> injection helped some.  MRI of LS spine showed some mild disc
> disease at the L5-SI level.  CT/MRI of hips and pelvis negative
> except for probable "horse shoe" kidney.  She is able to do some
> light household chores and jumps on a trampoline for
> strengthening.  Standing/walking would be limited to a total of 3-4
> hours in an 8 hour day because of pain.

Id.

Dr. Whittle also determined that, in terms of postural limitations, Ms. Blodgett could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, could frequently balance, and could occasionally stoop, kneel, crouch, or crawl. AR 158. Ms. Blodgett had no manipulative, visual, communicative, or environmental limitations. AR 159-160. Dr. Whittle noted that, although the exact etiology of Ms. Blodgett's symptoms was unknown, chronic groin muscle strain was a possibility. AR 161.

On June 19, 2006, Dr. Kristin A. Jensen, another medical consultant for the Agency, also completed a PRFC to assess Ms. Blodgett's then-current residual functional capacities. AR 166-173. Dr. Jensen noted that Ms. Blodgett's primary diagnosis was of degenerative disc disease (SI joint degenerative disc) with a secondary diagnosis of groin pain, obesity, hypertension, and hypothyroidism. AR 166. After considering all of the evidence in Ms. Blodgett's file, Dr. Jensen determined that Ms. Blodgett had the following exertional limitations: occasionally lift and/or carry (including upward pulling) up to 20 pounds; frequently lift and/or carry (including upward pulling) up to 10 pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and unlimited ability to push and/or pull (including operation of hand and/or foot controls). AR 167.

Dr. Jensen determined that, in terms of postural limitations, Ms. Blodgett could climb ramps and stairs only occasionally, could never climb ladders, ropes, or scaffolds, could frequently balance, and could occasionally stoop, kneel, crouch, or crawl. AR 163. Dr. Jensen also determined that Ms. Blodgett had no manipulative, visual, or communicative limitations, but had a limited environmental limitation in that she should avoid concentrated exposure to hazards (machinery, heights, etc.) due to her pain. AR 169-170.

Dr. Jensen stated that she considered the intensity of Ms. Blodgett's pain when determining her residual functional capacity, but the "objective physical findings do not seem to account for its intensity." AR 171.

### 4. Assessments Completed by Dr. Lorelee Stock

#### a. December, 2005, Opinion

On December 16, 2005, Dr. Lorelee Stock completed a questionnaire describing Ms. Blodgett's limitations. AR 262-263. Dr. Stock noted that she began seeing Ms. Blodgett on November 13, 2004. AR 262. Dr. Stock opined that Ms. Blodgett could sit for six hours a day, stand for 20 minutes (apparently for the entire day), walk for 200 feet, and lift 10-20 pounds. AR 263. Dr. Stock further opined that Ms. Blodgett could work "part time [doing] secretarial work [secondary] to lifting or pushing more [than] 5-10 pounds." Id.

### b. July, 2007, Opinion

On July 13, 2007, Dr. Stock completed a medical source statement assessing Ms. Blodgett's physical ability to perform work-related activities. AR 340-346. Dr. Stock determined that Ms. Blodgett could occasionally[17] lift up to 10 pounds, occasionally carry up to 10 pounds, sit for 30 minutes at one time without interruption for a total of three hours in an eight-hour workday, stand for 10 minutes at one time without interruption for a total of one hour in an eight-hour workday, and walk for two to five minutes at one time without interruption for a total of one hour in an eight-hour workday. AR 340-341. Dr. Stock stated that Ms. Blodgett should alternate sitting and standing throughout an eight-hour workday. AR 341. Dr. Stock also stated that it was medically necessary for Ms. Blodgett to use a cane when ambulating. Id. Dr. Stock noted a mild, generalized weakness in Ms. Blodgett's use of her hands and a moderate to moderately severe, gross generalized LE weakness in Ms. Blodgett's use of her feet. AR 342. Dr. Stock determined that Ms. Blodgett could only occasionally operate foot controls. Id.

In terms of postural activities, Dr. Stock determined that Ms. Blodgett could never climb stairs, ramps, ladders, or scaffolds, could never kneel or crouch, and could only occasionally balance, stoop, or crawl. AR 343.

---

[17]The medical source statement defined occasionally as "very little to one-third of the time." AR 340.

Dr. Stock noted that Ms. Blodgett had no restrictions or limitations to her hearing or vision.  Id.  In terms of environmental limitations, Ms. Blodgett could never tolerate exposure to unprotected heights or moving mechanical parts, could occasionally tolerate exposure to operating a motor vehicle, extreme cold, extreme heat, vibrations, or moderate noise, could frequently tolerate exposure to humidity and wetness, and could continuously tolerate exposure to dust, odor, fumes, and pulmonary irritants.  AR 344.  Dr. Stock concluded that Ms. Blodgett's limitations restricted her activities as follows: she could only occasionally or sporadically perform activities like shopping; she could not travel without a companion for assistance, ambulate without using an assistive device, or walk a block at a reasonable pace on rough or uneven surfaces; she could use standard public transportation if handicap accessible; she could only occasionally or sporadically climb a few steps at a reasonable pace with the use of a hand rail; and she could prepare a simple meal and feed herself, care for personal hygiene, and sort, handle, and use papers and files.  AR 345.  Dr. Stock noted that Ms. Blodgett could not climb up and down stairs or ladders, could not stoop or kneel, and could not be exposed to heights.  Id.  Dr. Stock indicated that Ms. Blodgett's limitations would last for 12 consecutive months.  Id.

**5. Mental Health Assessments Completed by Dr. Robert Pelc**

On June 29, 2007, Dr. Robert E. Pelc, a clinical and forensic psychologist, completed a psychiatric review technique form and a medical source statement. AR 323-339. In the psychiatric review technique form, Dr. Pelc assessed Ms. Blodgett's mental health impairments from January 1, 2004, to June 29, 2007. AR 323. Ms. Blodgett suffered from a non-severe impairment, specifically moderate MDD[18] or depression. In Ms. Blodgett's case, this affective disorder was characterized by psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and occasional thoughts of suicide. AR 323, 326. Dr. Pelc opined that Ms. Blodgett's depression resulted in the following functional limitations: mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. AR 333. Dr. Pelc noted no episodes of decompensation. Id. Dr. Pelc determined that Ms. Blodgett's psychological issues did not result in specific limits to her activities of daily living or significant limits to her social activities. AR 335. Progress notes indicated that Ms. Blodgett's mood improved when taking prescribed medication. Id.

---

[18]Major depressive disorder.

In the medical source statement, Dr. Pelc assessed Ms. Blodgett's mental ability to perform work-related activities on a sustained basis.[19]  AR 337. Dr. Pelc noted that treatment notes from Ms. Blodgett's primary care physician indicated that she began suffering from depression in 2005.  AR 338. Dr. Pelc opined that Ms. Blodgett's depression did not result in any restrictions in her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decision.  <u>Id.</u> However, her depression resulted in a mild restriction in her ability to understand and remember complex instructions, carry out complex instructions, and make judgments on complex work-related decisions.  <u>Id.</u> Dr. Pelc further opined that Ms. Blodgett's depression resulted in only a mild restriction in her ability to interact appropriately with the public, supervisors, and co-workers and to respond appropriately to usual work situations and changes in a work setting.  AR 338.

## ADMINISTRATIVE HEARING

Ms. Blodgett's administrative hearing was held on July 18, 2007, before ALJ James W. Olson.  AR 366.  Ms. Blodgett retained attorney Larry Plank to represent her at the hearing.  AR 368.  Dr. Pelc testified as to Ms. Blodgett's psychological impairments, stating that the record demonstrated that she

---

[19]" 'Sustained basis' means the ability to perform work-related activities eight hours a day for five days a week, or an equivalent work schedule."
AR 337.

suffered from depression.  AR 369-370.  The substance of Dr. Pelc's testimony is as follows:

> There are treatment notes primarily from a primary care physician. There's limited other mental health records in this entire file.  And the descriptions that are given indicate generally that the Claimant has been responsive to anti-depressant medications which have been...prescribed, and that there is then no significant severe symptoms, or no severe limitations which are documented in...any of the record.  In fact, the progress notes seem to reflect that her mood gets better when she is following the prescribed treatment regimen, which is the medications that she's been administered. And as a result, I didn't find documented any specific limitations that would be attributed to her psychological condition, and certainly none at a significant or marked level in any of the functional domains that...are usually referred to as B criteria.

AR 370-371.

Ms. Blodgett testified that she lived in Rapid City, South Dakota, was 40 years old, was married to Craig Blodgett, and had two children–a daughter, age 14, and a son, age 4.  AR 371, 378.  She testified that she had been disabled since January 1, 2004, due to groin pain, weakness in her legs, depression, and urinary incontinence.  AR 372.  She experienced pain in her groin area near the upper left leg, but the pain did not radiate down her leg.  Id. Ms. Blodgett testified that she constantly experienced pain in that area, with increased pain when "[s]itting for a long time, standing, [and] walking."  Id.  On a scale of one to ten with ten being the "worst imaginable pain," the pain she experienced, on average, was equal to a level of four or five, but was a level 10 at its most severe.  AR 373.  Ms. Blodgett used ice packs and pain medication

to alleviate her pain, but experienced side effects of dizziness, lightheadedness, and a burning sensation in her stomach as a result of the medication use.  Id. She also testified that both of her legs were weak and that she worried "about them giving out."  Id.  In light of this weakness in her legs and resulting lack of balance, Ms. Blodgett relied on Canadian crutches[20] when ambulating outside her home and a walker when ambulating inside her home.[21]  AR 373-374.

Ms. Blodgett testified that she also experienced bladder leakage, necessitating frequent trips to the bathroom and the use of 10-12 pads per day.  AR 374-375.  Ms. Blodgett testified that she was five feet, five inches in height and weighed 260 pounds.  AR 375.  Her primary care physician as of November 2004 was Dr. Lorelee Stock.  AR 375-376.

Ms. Blodgett then testified as to her ability to sit, stand, walk, and carry objects.  She stated that she could sit for 20 to 30 minutes before needing to get up, could stand for 10 minutes using Canadian crutches, could walk slowly

---

[20]Canadian crutches, or forearm crutches, are designed to be weight bearing at the forearm area rather than at the shoulder area as with axilla, or underarm, crutches.  See http://everything2.com/title/Canadian%2520crutches.  Canadian crutches are not meant to support the full weight of the user, but rather are "partial bearing" devices used primarily to give stability to the user as opposed to leverage.  Id.  Canadian crutches are similar to a cane in structure, but with a cuff that encircles the user's forearm above the hand grip.  Id.

[21]Ms. Blodgett testified that she began using Canadian crutches in July of 2005.  AR 373-374.  Before that time, beginning in January of 2004, she used wooden crutches and a cane when ambulating.  AR 374.

for one quarter of a city block using Canadian crutches before needing to stop, could safely lift 10 pounds, could not carry any object over any distance because of her use of Canadian crutches, and could not bend or lean down.

AR 376-377.  She relied on a "grabber" to retrieve objects from the floor. AR 377.

Ms. Blodgett also described her typical day.  She awoke between 6:00 a.m. and 7:00 a.m., and her husband assisted her in getting in and out of the shower and putting on her pants and shoes.  AR 377, 380.  Ms. Blodgett then prepared cereal for herself and her children and washed the breakfast dishes. AR 377.  After visiting with her children, she and her daughter tidied the house.  Id.  Ms. Blodgett stated that she was unable to vacuum, sweep, mop, or do laundry because she needed to hold onto her walker or cane when ambulating.  AR 378-379.  Ms. Blodgett prepared lunch for herself and her children and then spent her afternoons watching television and visiting with her children.  AR 377-378.  Ms. Blodgett stated that she need to apply an ice pack to her leg in the afternoon.  AR 378.  After coming home from work, her husband prepared the evening meal.  Id.  After dinner, Ms. Blodgett often played cribbage with her husband and watched the evening news.  Id.  Her husband then helped the children prepare for bed.  Id.  Ms. Blodgett stated that she shopped twice a month, but only at Walmart because Walmart

38

provided electronic carts.  AR 379.  Her husband always accompanied her on these shopping trips.  Id.  Ms. Blodgett drove about once a month and always in town.  AR 380.

Ms. Blodgett then discussed her social activities.  She stated that her sister and mother visit a few times a week.  Id.  Ms. Blodgett went out to dinner "[o]nce in awhile."  Id.  She never went to the movie theater or rented movies because she had cable television.  AR 380-381.  She went to church twice a month.  AR 381.  She enjoyed reading.  Id.  For exercise, Ms. Blodgett stretched her legs and moved about the house.  Id.  Ms. Blodgett's sister bought her a small, jogging trampoline to exercise on, but Ms. Blodgett stopped using the trampoline after only two times because she had to use her walker to hold onto and her feet and legs hurt.  AR 381-382.

Ms. Blodgett testified that she was not working currently, but had worked at the Primrose Retirement Community Center as a caretaker until the end of January 2004.  AR 382.  She then went back to work as a cook at the same retirement center from April 5, 2004, to December 30, 2004.  Id.  During this period, she worked only part-time (three hours a day, five days a week) and was paid $8.65 an hour.  Id.  Ms. Blodgett testified that her medical condition forced her to terminate her employment at the retirement center both in January 2004 and December 2004.  AR 382, 383.

William Tysdal, a vocational rehabilitation counselor, testified at the administrative hearing as a vocational expert. AR 384. Mr. Tysdal reviewed Ms. Blodgett's work history, noting that several past jobs were semiskilled and required light to medium exertion. AR 385. The ALJ then posed his first hypothetical question to Mr. Tysdal:

> Assume you have a younger individual with a high school plus education, who is limited to sedentary work, has limits, psychological limits at [Exhibit] 17F,[22] can you identify any jobs that person could to [sic], either to which skills would transfer, or unskilled work?

AR 386.

Mr. Tysdal answered as follows:

> There would be sedentary unskilled work and I believe the sales skills would transfer to at least one, well, one sedentary job, that is telephone solicitor. As I said, it's sedentary exertionally and SVP three. Nationally, about 100,000 positions exist, and regionally about 2500.

Id.

Mr. Tysdal went on to state:

> [S]o then at the unskilled level, one example would be telephone information clerk, again, sedentary exertionally, and unskilled, SVP two. Nationally, I'm showing about 50,000 positions existing, and regionally, about 700.[23]

---

[22]The ALJ later clarified that he was referring to Exhibit 16F, the medical source statement prepared by Dr. Pelc to evaluate Ms. Blodgett's mental ability to do work-related activities. AR 386, see also AR 337-339.

[23]Mr. Tysdal stated that the job duties for a telephone information clerk would be to answer the telephone and to provide information to callers. AR 387.

Id.

The ALJ then posed a second hypothetical question to Mr. Tysdal:

> Assume the same psychological limits at 16F, and these physical
> limits. Sit 20 to 30 minutes, stand 10 minutes, and walk a quarter
> of a block with assistance, assistance being...a cane or crutch, or
> something like that. Is limited in lifting 10 pounds. Is unable to
> bend over and touch her toes, unable to stoop. Can you identify
> any jobs that person could do?

AR 387.

The AlJ clarified that, for purposes of this second hypothetical, Mr. Tysdal

should assume that the individual was "able to perform that sitting and

standing for an eight hour work day." Id. Mr. Tysdal testified that such an

individual could perform the duties of a telephone solicitor or telephone

information clerk. Id.

Ms. Blodgett's attorney questioned Mr. Tysdal about Dr. Stock's medical

source statement. AR 387. Mr. Tysdal opined that the limitations described by

Dr. Stock would preclude work activity. Id.

## THE ALJ'S DECISION

On July 26, 2007, ALJ Olson filed a written opinion on Ms. Blodgett's

claim for SSI and DIB benefits. AR 21-35. The ALJ considered the five-step

evaluation process established by the Agency for determining whether a

claimant is disabled.[24] AR 22-27. The ALJ made several findings of facts and

---

[24]The five-step sequential evaluation process is: (1) whether the claimant
is presently engaged in a "substantial gainful activity"; (2) whether the claimant

conclusions of law. First, the ALJ found that Ms. Blodgett met the insured status requirements of the Social Security Act through December 31, 2009. AR 27. The ALJ also found that Ms. Blodgett had not engaged in substantial gainful activity at any time since January 1, 2004, the alleged onset date of disability. Id.

The ALJ determined that Ms. Blodgett had "a history of groin pain, degenerative disc disease and protrusion, and obesity, impairments considered to be 'severe' under the Social Security Regulations..." Id. The ALJ determined, however, that Ms. Blodgett's high blood pressure and depression were not severe impairments. AR 27-28. The ALJ found that Ms. Blodgett did not have an impairment or combination of impairments that met or was equal to an impairment listed in the Social Security regulations. AR 28-29.

The ALJ evaluated Ms. Blodgett residual functional capacity as follows:

> [T]he claimant retains a residual functional capacity to sit for 20 to 30 minutes at one time, stand for 10 minutes at one time, walk for one-quarter of a block at one time with the assistance of a cane or crutch, who can perform sit, stand, and walk activities for 8 hours

---

has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner of the Agency to prove that there are other jobs in the national economy that the claimant can perform. Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998); see also AR 22-27.

in an 8-hour workday, who is limited to 10 pounds lifting and
carrying, and who is unable to bend and touch her toes and
unable to stoop.

AR 29.

The ALJ found that, although Ms. Blodgett's impairments could have

produced the alleged symptoms, her "statements concerning the intensity,

persistence and limiting effects of these symptoms [were] not entirely credible."

AR 30.  In discrediting Ms. Blodgett's subjective complaints of pain, the ALJ

noted that testing results indicated no abnormality that could account for the

severe groin pain alleged by Ms. Blodgett.  AR 30-31.  Further, the record

contained statements made by Ms. Blodgett that indicated that she had no

disabling pain when sitting or ambulating and experienced only short-term

pain when arising from a seated position.  Id.  The ALJ also noted that

Ms. Blodgett engaged in work activity after the alleged onset date of her

disability and did so while caring for a baby, leading the ALJ to conclude that

Ms. Blodgett's daily activities had at times "been somewhat greater" than she

had reported.  AR 31.

The ALJ also considered Ms. Blodgett's activities of daily living, finding

that her typical day consisted of sitting and watching television and overseeing

and caring for her children.  AR 31-32.  The ALJ noted that Ms. Blodgett

testified at the administrative hearing that she "could sit for 20 to 30 minutes

at one time, stand for 10 minutes at one time, [and] walk for one-quarter of a

block," yet, elsewhere in the record, she reported no pain when sitting and only temporary groin pain when arising from a seated position or rolling over in bed. AR 31. Ms. Blodgett also testified at the hearing that she could lift and carry only 10 pounds, yet the ALJ reviewed "[c]ollateral information" that suggested she could lift 10-15 pounds. AR 32. The ALJ also considered reports from Craig Blodgett, but found that such reports added "little information" as Mr. Blodgett alleged limitations even greater than his wife's own reports. Id.

The ALJ also considered opinion evidence consisting of two PRFCs, a questionnaire, and a medical source statement. Id. Both PRFCs, prepared by two different medical consultants, opined that Ms. Blodgett "could lift and/or carry twenty pounds occasionally and 10 pounds frequently, stand and/or walk (with normal break) for a total of about 6 hours in an 8-hour workday, was unlimited in push and/or pull activities (including operation of hand and/or foot controls) other than as shown for lift and/or carry, frequently balance, occasionally climb,[25] stoop, kneel, crouch and crawl, and had no established manipulative, visual, communicative or environmental limitations."[26] AR 32.

_____

[25]The assessment prepared by Dr. Jensen added that Ms. Blodgett could "occasionally climb ramps and stairs but should never be required to climb ladders, ropes or scaffolds..." AR 32.

[26]The assessment prepared by Dr. Jensen added that Ms. Blodgett "had no established manipulative, visual, communicative or environmental limitations except to avoid concentrated exposure to hazards (machinery,

The questionnaire, prepared in December of 2005 by Dr. Stock stated that Ms. Blodgett "could lift 10 to 20 pounds, sit for 6 hours a day, stand for 20 minutes, and walk for 200 feet." Id. The medical source statement, prepared in July of 2007 also by Dr. Stock, stated that Ms. Blodgett "could occasionally lift and carry up to 10 pounds, sit for 30 minutes at one time and for 3 hours total in an 8-hour workday, stand for 10 minutes at one time and for 1 hour total in an 8-hour workday, walk for 2 to 5 minutes at one time and for a hour total in an 8-hour workday, had no limitations with reaching, handling, fingering, feeling, or push/pull bilaterally, could occasionally operate foot controls bilaterally, could never climb stairs or ramps, could occasionally balance, stoop, and crawl but could never kneel or crouch..." AR 32-33.

The ALJ found that Dr. Stock's opinions were not entitled to controlling weight and, indeed, accorded "little weight to Dr. Stock's opinions in these assessments." AR 33. The ALJ noted that, while Dr. Stock opined in her questionnaire that Ms. Blodgett could not perform any substantial gainful employment, such opinion was not dispositive as it was the province of the Commissioner to determine the ultimate issue of disability. Id. The ALJ also noted that records from IHS, where Dr. Stock worked, indicated "little and/or conservative treatment, and are generally of medication refills." Id. The ALJ found that the IHS treatment records offered little guidance or probative value.

heights, etc.)." AR 32.

Id.  The records contained no firm diagnoses or opinions as to the etiology of

Ms. Blodgett's groin pain nor any objective clinical findings to support

Dr. Stock's opinions as to Ms. Blodgett's physical capabilities.  Id.  The ALJ

noted that Dr. Stock's opinions, as expressed in both the questionnaire and

medical source statement, were inconsistent with Ms. Blodgett's own reports of

her physical limitations and daily activities.  Id.  Finally, the ALJ determined

that Dr. Stock, when forming her opinions, considered Ms. Blodgett's

depression and urinary incontinence, impairments that the ALJ found to be

not severe.  Id.

The ALJ determined that Ms. Blodgett was unable to perform her past

relevant work.  AR 33-34.  The ALJ noted that, at the time of the alleged onset

date of disability, Ms. Blodgett was 37 years old and was a "younger individual"

as defined by the Social Security regulations.  AR 34.  Ms. Blodgett had at least

a high school education.  Id.  The ALJ found that Ms. Blodgett acquired work

skills from past relevant work in semiskilled jobs.  Id.  Upon consideration of

Ms. Blodgett's age, education, work experience, and residual functional

capacity, the ALJ determined that Ms. Blodgett's acquired work skills were

"transferrable to other occupations with jobs existing in significant numbers in

the national economy…"  Id.  The ALJ relied heavily on the testimony of

Mr. Tysdal, specifically his answers to the two hypothetical questions posed by

the ALJ.  Id.  The ALJ concluded that Ms. Blodgett had not been disabled from

January 1, 2004, the alleged onset date of disability, through the date of the his decision.  Id.  Thus, the ALJ held that Ms. Blodgett was not entitled to either DIB or SSI benefits.  Id.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole.  See 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); see also McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000); Richardson v. Perales, 402 U.S. 389, 401 (1971).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  See Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006); Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000).  The court's role under § 405(g) is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence.  See Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).

A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "

47

Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)); see also Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004). The court must review the Commissioner's decision to determine if an error of law has been committed. See Olson ex rel. Estate of Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992). Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act. See Smith, 982 F.2d at 311; see also Olson ex rel. Estate of Olson, 170 F.3d at 824. If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently. See Baker, 457 F.3d at 892.

## DISCUSSION

Because the ALJ found in Ms. Blodgett's favor for the first four steps of the five-step sequential analysis, Ms. Blodgett challenges only the ALJ's step-five determination that there are other jobs in the national economy that Ms. Blodgett can perform. See footnote 23, supra. With respect to this determination, Ms. Blodgett alleges that the ALJ made the following two errors of law that warrant the reversal of the ALJ's decision: (1) the ALJ improperly evaluated and discredited Ms. Blodgett's subjective complaints and (2) the ALJ improperly rejected the 2007 medical source statement prepared by Dr. Stock, Ms. Blodgett's treating physician. See Docket 8.

**A.    Ms. Blodgett's Subjective Complaints**

Ms. Blodgett argues that the ALJ erred in finding that she was not entirely credible in describing the intensity, persistence, and limiting effects of her alleged symptoms.  Id.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."  Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001).  "A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question."  Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (citing Polaski v. Heckler, 739 F.2d 1320, 1322) (8th Cir. 1984)); see also Goodale v. Halter, 257 F.3d 771, 774 (8th Cir.2001) (noting that an ALJ may discount subjective complaints if there are inconsistencies in the evidence as a whole). "In assessing the credibility of a claimant's subjective pain complaints, the ALJ is to consider factors including the claimant's prior work record; the claimant's daily activities; observations of the claimant by third parties and treating and examining physicians; the duration, frequency, and intensity of the claimant's pain; precipitating and aggravating factors; the dosage, effectiveness, and side effects of the claimant's medication; treatment, other than medication, for relief of the claimant's pain; and functional restrictions on the claimant's activities." Gonzales, 465 F.3d at 895 (citing Polaski, 739 F.2d at 1322); see also Guilliams, 393 F.3d at 802 ("A claimant's subjective complaints may be

discounted if there are inconsistencies in the record as a whole.  In evaluating subjective complaints, however, the ALJ must consider objective medical evidence, as well as any evidence relating to the so-called <u>Polaski</u> factors...")  (additional citations omitted).

"Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.' " <u>Gonzales</u>, 465 F.3d at 895 (citing <u>Ramirez v. Barnhart</u>, 292 F.3d 576, 581 (8th Cir.2002) (internal citation omitted)).  "In rejecting a claimant's complaints of pain as not credible," an ALJ is expected "to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' " <u>Guilliams</u>, 393 F.3d at 802 (quoting <u>Lewis v. Barnhart</u>, 353 F.3d 642, 647 (8th Cir. 2003)).

The ALJ's decision to discredit Ms. Blodgett's subjective complaints of disabling pain is supported by substantial evidence in the record.  The ALJ acknowledged that Ms. Blodgett's impairments "may cause her some discomfort and pain."  AR 31.  The ALJ determined Ms. Blodgett's residual functional capacity as follows:

> [T]he claimant retains a residual functional capacity to sit for 20 to 30 minutes at one time, stand for 10 minutes at one time, walk for one-quarter of a block at one time with the assistance of a cane or crutch, who can perform sit, stand, and walk activities for 8 hours

in an 8-hour workday, who is limited to 10 pounds lifting and carrying, and who is unable to bend and touch her toes and unable to stoop.

AR 29.

In making this determination, the ALJ *fully* credited Ms. Blodgett's testimony regarding her own functional limitations. AR 376. However, the ALJ found that Ms. Blodgett's pain, although present, was not disabling, that is, was not "so severe...as to preclude any substantial gainful activity." Id. The ALJ noted that Ms. Blodgett had been able to engage in some employment after her alleged disability onset date of January 1, 2004. AR 31. On March 23, 2004, Ms. Blodgett requested to return to work as a cook for two to three hours a day and was provided a prescription to return to work. AR 207. On April 6, 2004, Ms. Blodgett indicated that she was "tolerating" her limited work hours. AR 203. On August 17, 2004, Ms. Blodgett indicated that she could work for two hours at a time as a cook. AR 214. These statements were made months after Ms. Blodgett's alleged onset disability date of January 1, 2004. See AR 104, 351. The ALJ found that, although this work did not qualify as substantial gainful employment, it suggested that Ms. Blodgett's daily activities had at times "been somewhat greater" than she had reported, particularly since Ms. Blodgett was caring for a baby/toddler at the time–a strenuous task by itself. AR 31.

Additionally, the objective medical evidence does not support Ms. Blodgett's allegations of *disabling* pain. On January 6, 2004, an x-ray of Ms. Blodgett's hip was taken. AR 190. The x-ray showed no bony abnormalities or evidence of fracture, significant arthritic change, or foreign body. Id. The bones and soft tissue appeared normal. Id. On January 15, 2004, a high field MRI scan of Ms. Blodgett's pelvis was done. AR 197. The scan showed Ms. Blodgett's pelvis and hip to be normal. Id. Shortly thereafter, on January 21, 2004, a total body bone scan was performed, and the results were normal. AR 195. The bone scan did note a very mild increased activity involving the right inferior sacroiliac joint, however, this activity occurred on the opposite side as Ms. Blodgett's symptoms. Id. An MRI scan of Ms. Blodgett's lumbar spine was taken on April 1, 2004. AR 206. The scan revealed no abnormality that accounted for Ms. Blodgett's groin pain. Id. The small disc herniation at L5-S1 definitely did not impinge on her nerve roots. Id. An MRI scan of Ms. Blodgett's lumbar spine was taken on January 5, 2005. AR 227-228. The scan indicated degenerative disc protrusion at L5-S1 which seemed to be chronic, however, the disc protrusion did not impinge on individual root nerves. AR 227. A CT scan of Ms. Blodgett's pelvis was taken on February 9, 2005. AR 243. The scan did not identify any specific abnormality other than what appeared to be a horseshoe kidney. Id. An MRI

scan of Ms. Blodgett's brain was taken on April 20, 2005.  AR 241.  The results of the scan were negative, showing no abnormalities.  Id.

Ms. Blodgett's testimony regarding her functional limitations seems at odds with prior statements she made to medical providers.  On July 18, 2007, Ms. Blodgett testified at the administrative hearing that she *constantly* experienced pain in the groin area near her upper left leg, with increased pain when "[s]itting for a long time, standing, [and] walking."  AR 372.  She testified that, on a scale of one to ten with ten being the "worst imaginable pain," the pain she experienced was, on average, equal to a level of four or five, but was a level 10 at its most severe.  AR 373.  However, on February 9, 2004, Ms. Blodgett complained of "shocking, stabbing pain" most notable when standing up or shifting positions while seated.  AR 211.  She rated her pain as a "0/10 at present, a 10/10 at its worst, and a 0/10 at its best."  Id.  Her pain was worse when standing up and upon awakening each morning, but she "loosen[ed] up" after a few minutes.  Id.  Keeping her legs still provided some relief.  Id.  Sitting and lying down relieved her pain.  Id.  Ms. Blodgett indicated that she could no longer walk, turn, or lift because of the pain and that she *occasionally* needed to sit or lie down to control her pain.  AR 212.  On March 8, 2004, Ms. Blodgett rated her pain as 0/10 in a seated position, arising from a seated position increased her pain to 8/10, yet her pain resolved when ambulating.  AR 210.  On March 23, 2004, Ms. Blodgett requested to

return to work for three hours a day as a cook, stating that she felt able to do the work as long as she remained in a *standing* position.  AR 208.  On May 3, 2004, Ms. Blodgett reported experiencing no pain when sitting.  AR 202.  Her pain was most acute when arising from a seated position or when flexing either hip.  Id. She rated her pain when standing and walking between 4/10 and 8/10, with 0/10 pain at its best.  Id.  On August 17, 2004, Ms. Blodgett stated that the pain was manageable when "she's up and around," although the pain never completely disappeared.  AR 214.  On December 29, 2004, Ms. Blodgett complained of constant, severe pain in the left and right sacroiliac area. AR 217.  Ms. Blodgett also stated that walking forward and any jarring motion caused severe pain.  AR 220.  On December 8, 2005, Ms. Blodgett indicated that she could only sit for approximately 30 minutes at one time.  AR 142. On February 14, 2006, Ms. Blodgett described her pain as a sharp jabbing sensation which is precipitated when extending her left leg forward or when sitting or standing.  AR 302.  In a letter dated July 10, 2006, Ms. Blodgett's attorney stated that Ms. Blodgett could sit for only a few minutes.  AR 84. On July 18, 2007, Ms. Blodgett testified that she could sit for 20 to 30 minutes before needing to get up.

Further, the description provided by Craig Blodgett as to his wife's functional limitations differs from that provided by Ms. Blodgett herself.  On April 14, 2005, Mr. Blodgett stated that his wife could walk less than 50 feet

before needing to stop and rest, needed to rest for one to two minutes before resuming walking, and could lift a maximum of 10-15 pounds.  AR 123.  Also on April 14, 2005, Ms. Blodgett stated that she could walk for about 20-30 steps before needing to stop and rest, could resume walking after a minute or two of rest, and could not lift her son (30 pounds).  AR 131.

Another notable inconsistency surrounds Ms. Blodgett's one-time use of a wheelchair.  On December 29, 2004, Ms. Blodgett was seen at the Black Hills Health and Wellness Center.  AR 217.  Ms. Blodgett was in a wheelchair and was unable to get up or ambulate without assistance.  Id.  Ms. Blodgett stated that she had fallen the day prior.  AR 220.  She was determined to be "in an acute phase."  AR 217.  Yet, a few days later, on January 4, 2005, when Ms. Blodgett was seen by Dr. Maxwell of The Spine Center, it was reported that Ms. Blodgett was in mild to moderate discomfort, but did not appear to be acutely distressed.  AR 231.  Dr. Maxwell observed that Ms. Blodgett moved about "exceedingly slowly" with "large grimace and vocal commentary to movement."  Id.  It took Ms. Blodgett approximately eight minutes to move from her chair to the exam table.  Id.  Yet, Ms. Blodgett was able to ambulate on her toes and heels without difficulty, and tandem walking was normal.  AR 234.  These inconsistencies in the record support the ALJ's decision that Ms. Blodgett's pain is not as severe or disabling as she alleges.

The court also notes that there is nothing in the record to suggest that Ms. Blodgett was ever prescribed a wheelchair, walker, or even the Canadian crutches upon which she relies so heavily. It is unclear whether Ms. Blodgett was prescribed a cane. IHS treatment records show that, on January 26, 2004, Ms. Blodgett indicated that she would like a cane, but there is no indication that a doctor ever prescribed it. AR 294. In January of 2004, Dr. Boyer prescribed wooden crutches, but Ms. Blodgett stopped using them in July 2005 when she began using non-prescribed Canadian crutches. AR 192, 374. Ms. Blodgett's use of non-prescribed assistive devices does not bolster her credibility regarding subjective complaints of disabling pain. See Guilliams, 393 F.3d at 802-803 (affirming an ALJ's discrediting of the claimant's subjective complaints of back pain where claimant used a cane, but no medical prescription for the cane existed; where several medical exams revealed the claimant to be in no significant distress; where MRIs of the spine revealed essentially normal findings; where the claimant's muscle mass was not atrophied despite his allegation of restriction of motion and diminishment of strength; where the claimant declined to follow medical advice regarding treatment of his pain; and where medical evidence demonstrated that pain medication alleviated the claimant's symptoms of pain).

Another inconsistency in the record involves Ms. Blodgett's claim of urinary incontinence. The ALJ found Ms. Blodgett's urinary incontinence to

not be a severe impairment, and Ms. Blodgett does not appear to be challenging this determination. The inconsistencies in the record regarding this topic, however, supports the ALJ's determination that Ms. Blodgett's complaints are not entirely credible.

On February 9, 2004, Ms. Blodgett specifically denied any bowel or bladder incontinence, yet, at the administrative hearing, she testified that she had been disabled since January 2004 due, in part, to urinary incontinence. AR 211, 212, 372. Also on February 9, 2004, she stated that she experienced urinary frequency at night while pregnant, but this condition had been resolved. AR 212. On January 4, 2005, Ms. Blodgett stated that she had some urinary urgency, but denied any incontinence of her bowel or bladder. AR 230. During the same examination, Ms. Blodgett denied experiencing urinary frequency or bladder problems, yet, at the administrative hearing, she testified that she experienced urinary frequency. AR 231, 375. On December 8, 2005, Ms. Blodgett stated that suffered from severe incontinence and that her incontinence embarrassed her. AR 141, 142. Ms. Blodgett complained of bladder urgency and frequency on February 14, 2006. AR 302. On July 10, 2006, when appealing the denial of her claims for benefits, Ms. Blodgett, through her attorney, alleged that she suffered from urinary incontinence, among other conditions. AR 84. On April 20, 2007, Ms. Blodgett indicated that she became incontinent when not taking Oxybutynin. AR 313. In a letter

dated July 2, 2007, Mr. Blodgett described his wife as making at least four bathroom visits in a course of an eight-hour day, yet Ms. Blodgett testified at the administrative hearing that she made three to five bathroom visits a day. AR 149, 375. Ms. Blodgett testified that this condition necessitated the use of 10-12 pads per day, yet it appears that she did not report this to any of her doctors. AR 374-375.

In terms of treatment, Ms. Blodgett reported in February of 2004 that Darvocet and hot showers provided some relief for her pain as did ice and bed rest. AR 211. On March 8, 2004, she believed that she could ambulate further and tolerate her exercises better since undergoing physical therapy. AR 210. Yet, a week later, Ms. Blodgett indicated that physical therapy did not provide relief, and her physical therapy sessions were terminated based on her report. AR 208. Following a steroid injection in May of 2004, Ms. Blodgett reported a 50% improvement, with the pain being completely absent for three to four days. AR 204. However, a few weeks later, she reported only a 20% improvement after the second injection. AR 199. It was recommended that Ms. Blodgett undergo a gynecological evaluation. Id. The record shows no evidence that she followed this recommendation. In June of 2004, Ms. Blodgett again stated that Darvocet helped manage her pain. AR 291. She also stated that steroid injections and chiropractic care also helped for a

short time.  Id.  In August of 2004, she reported that chiropractic care seemed to have "some benefit."  AR 214.

With respect to activities of daily living, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities."  Wagner v. Astrue, 499 F.3d 842, 852 (8th Cir. 2007) (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original).  Ms. Blodgett indicated that she was able to care for her hair, shave, use the toilet, and feed herself without aid, yet elsewhere she indicated that she required assistance to shower and shampoo her hair.  AR 127, 142. She was able to prepare meals and do light housekeeping chores like washing dishes, cleaning the toilet and sink, dusting, picking up the toys from the floor, and wiping the counters and stove top.  AR 120, 126, 128.  Most notably, Ms. Blodgett was able to care for her young son alone during the daytime, an undoubtedly strenuous task.  AR 126.  Ms. Blodgett was able to drive and went shopping about once a week, although, at the administrative hearing, she testified she only went shopping twice a month.  AR 121, 379.  Craig Blodgett stated that Ms. Blodgett could go out alone, yet Ms. Blodgett stated that she could not go out alone, presumably because she could not carry her son to and from her vehicle.  AR 121, 129.  In terms of hobbies, Ms. Blodgett watched television, read, did bead work, decorated cakes, and played cribbage.  AR 126,

130, 377, 388.  These hobbies require long periods of sitting, augmenting Ms. Blodgett's earlier statements that she experienced no pain when sitting. Ms. Blodgett also enjoyed socializing with her mother and sister a few times a week.  AR 380.

Further, Ms. Blodgett testified at the administrative hearing that her sister bought her a small, jogging trampoline to exercise on, but Ms. Blodgett stopped using the trampoline after only two times because she had to use her walker to hold onto and her feet and legs hurt.  AR 381-382.  Yet, in May of 2004, Ms. Blodgett indicated that she had been jumping on a trampoline to strengthen her lower extremities and that such activity did not increase her pain.  AR 199.

The court finds that substantial evidence in the record supports the ALJ's determination that Ms. Blodgett's complaints of *disabling* pain were not entirely credible.  There is no medical evidence to support Ms. Blodgett's allegation that the pain complained of is so severe as to be disabling.  Since January 1, 2004, the alleged onset date of disability, there was no significant event that would have exacerbated her symptoms to the extent described at the administrative hearing.  The ALJ considered Ms. Blodgett's own statements regarding the intensity and severity of her pain and her functional limitations as well as statements by medical providers and her husband.  Inconsistencies

in the record support the conclusion that Ms. Blodgett's pain is not as disabling as she alleges.

**B.     Opinions of Ms. Blodgett's Treating Physician**

Ms. Blodgett argues that the ALJ improperly rejected the July, 2007, medical source statement prepared by her treating physician, Dr. Stock.  See Docket 8.  Mr. Tysdal, the vocational expert, testified at the administrative hearing that a person with the limitations described in Dr. Stock's 2007 medical source statement would be precluded from all work activity.  AR 386, 387.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations."  Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006) (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)); see also Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (because RFC is a medical question, the ALJ's decision must be supported by some medical evidence of the claimant's ability to function in the workplace, but the ALJ may consider nonmedical evidence as well); Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence.").  The ALJ "still 'bears the primary responsibility for assessing a claimant's residual functional capacity based on

all relevant evidence.'" Guilliams, 393 F.3d at 803 (quoting Roberts v. Apfel,

222 F.3d 466, 469 (8th Cir. 2000)).

Medical opinions are considered evidence which the ALJ will consider in

determining whether a claimant is disabled, the extent of the disability, and the

claimant's RFC. See 20 C.F.R. § 416.927(a)(2). All medical opinions are

evaluated according to the same criteria, namely:

–whether the opinion is consistent with other evidence in the record;

–whether the opinion is internally consistent;

–whether the person giving the medical opinion examined the claimant;

–whether the person giving the medical opinion treated the claimant;

–the length of the treating relationship;

–the frequency of examinations performed;

–whether the opinion is supported by relevant evidence, especially
	medical signs and laboratory findings;

–the degree to which a nonexamining or nontreating physician provides
	supporting explanations for their opinions and the degree to which
	these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues
	related to his or her area of specialty; and

–whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 416.927(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir.

2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005)); 20 C.F.R. § 416.927(d)(2). While entitled to special weight, "[a] treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.'" Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)); see also House, 500 F.3d at 744. The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 416.927(d)(2)(I). One factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion is "if 'the treating physician evidence is itself inconsistent.'" House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786, and citing Wagner, 499 F.3d at 853-854, and Guilliams, 393 F.3d at 803). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)), Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003), and Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict.  Wagner, 499 F.3d at 849.  Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion.  Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)).  However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's RFC determination, such a conclusion may be supported by substantial evidence.  Harvey, 368 F.3d at 1016.

The court agrees with the ALJ that the IHS treatment records, including those of Dr. Stock, offer little guidance or insight into Ms. Blodgett's functional limitations.  The records contain no firm diagnoses or opinions as to the etiology of Ms. Blodgett's groin pain nor any objective clinical findings to support Dr. Stock's 2007 opinion as to Ms. Blodgett's physical capabilities.  The IHS records indicated "little and/or conservative treatment and are generally of medication refills."  AR 33.  The more in-depth examinations of Ms. Blodgett were conducted by other doctors upon referral.  Further, Dr. Stock's opinions, as expressed in the December, 2005, questionnaire and the July, 2007, medical source statement, appear inconsistent with each other, with

assessments done by other medical examiners, and with Ms. Blodgett's own reports of her physical limitations.

On April 14, 2005, Mr. Blodgett stated that his wife could walk less than 50 feet before needing to stop and rest, needed to rest for one to two minutes before resuming walking, and could lift a maximum of 10-15 pounds.  AR 123. Also on April 14, 2005, Ms. Blodgett stated that she could walk for about 20-30 steps before needing to stop and rest, could resume walking after a minute or two of rest, and could not lift her son (30 pounds).  AR 131.

On October 14, 2005, Dr. Whittle opined that Ms. Blodgett could occasionally lift and/or carry up to 20 pounds; frequently lift and/or carry up to 10 pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and had unlimited ability to push and/or pull (including operation of hand and/or foot controls).  AR 157.

On December 8, 2005, Ms. Blodgett stated that she could only sit for approximately 30 minutes at one time.  AR 142.  On December 16, 2005, Dr. Stock opined that Ms. Blodgett could sit for six hours a day, stand for 20 minutes (apparently for the entire day), walk for 200 feet, and lift 10-20 pounds.  AR 263.  She also opined that Ms. Blodgett could work "part time [doing] secretarial work [secondary] to lifting or pushing more [than] 5-10 pounds."  Id.

On June 19, 2006, Dr. Jensen opined that Ms. Blodgett could occasionally lift and/or carry (including upward pulling) up to 20 pounds; frequently lift and/or carry (including upward pulling) up to 10 pounds; stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and unlimited ability to push and/or pull (including operation of hand and/or foot controls). AR 167. In a letter dated July 10, 2006, Ms. Blodgett's attorney stated that Ms. Blodgett could sit for only a few minutes. AR 84.

On July 13, 2007, Dr. Stock determined that Ms. Blodgett could occasionally lift up to 10 pounds, occasionally carry up to 10 pounds, sit for 30 minutes at one time without interruption for a total of three hours in an eight-hour workday, stand for 10 minutes at one time without interruption for a total of one hour in an eight-hour workday, and walk for two to five minutes at one time without interruption for a total of one hour in an eight-hour workday. AR 340-341. Dr. Stock stated that Ms. Blodgett should alternate sitting and standing throughout an eight-hour workday. AR 341.

At the administrative hearing on July 18, 2007, Ms. Blodgett testified that she could sit for 20 to 30 minutes before needing to get up, could stand for 10 minutes using Canadian crutches, could walk slowly for one quarter of a city block using Canadian crutches before needing to stop, could safely lift 10

66

pounds, could not carry any object over any distance because of her use of Canadian crutches, and could not bend or lean down.

The court finds nothing in the record to account for the differences in the two assessments completed by Dr. Stock. For example, in the questionnaire dated December 16, 2005, Dr. Stock opined that Ms. Blodgett could sit for six hours a day, yet in the medical source statement dated July 13, 2007, Dr. Stock opined that Ms. Blodgett could sit for 30 minutes at one time without interruption for a total of three hours in an eight-hour workday. AR 376-377. There is no evidence in the medical record to account for this change in opinion.[27] The court also notes that, according to the record, Dr. Stock saw Ms. Blodgett for only three visits during 2006 and zero visits in 2007. Thus, Dr. Stock's 2007 assessment was not based on any direct examination of Ms. Blodgett–Ms. Blodgett's last visit with Dr. Stock occurred on December 4, 2006, nearly seven months before the 2007 assessment. Dr. Stock's medical source statement, therefore, is of no greater probative value than any of the other assessments prepared by other medical examiners.

Additionally, Dr. Stocks' opinions are not entirely consistent with

---

[27]As described elsewhere in this opinion, the only event that occurred in the record that was unusual was Ms. Blodgett's use of a wheelchair on December 29, 2004, due to acute pain associated with a fall the day prior. AR 217. A few days later, however, it was reported that Ms. Blodgett was in mild to moderate discomfort, but did not appear to be acutely distressed. AR 231. This event, then, cannot account for the more-restrictive limitations described by Dr. Stock in her 2007 assessment.

Ms. Blodgett's own assessments of her limitations or the assessments of Drs. Whittle and Jensen. Again, the ALJ fully credited Ms. Blodgett's testimony, given at the administrative hearing, as to her ability to sit for 20-30 minutes at one time, stand for 10 minutes at one time, walk for one-quarter of a block at one time with the use of an assistive device, lift up to 10 pounds, and not stoop or bend. The ALJ used these limitations to formulate his hypothetical question to Mr. Tysdal regarding occupations available to Ms. Blodgett. The ALJ did not give greater weight to any of the assessments completed by Drs. Whittle, Jensen, or Stock. The court acknowledges that Dr. Stock saw Ms. Blodgett for numerous office visits from November of 2004 through 2005. However, the purpose of many of these visits was to refill prescriptions, seek referrals to specialists, or review test results. Only minimal examinations were conducted during some of the office visits as opposed to the more thorough examinations conducted by referral doctors. Dr. Stock's treatment records offer little insight into the source of Ms. Blodgett's pain. Accordingly, the court finds that the ALJ did not err in refusing to give Dr. Stock's 2007 opinion controlling weight.

## CONCLUSION

The court recommends that the district court enter an order affirming the decision of the Agency to deny Ms. Blodgett's application for benefits and denying Ms. Blodgett's motion for summary judgment [Docket 7].

**NOTICE TO PARTIES**

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated April 17, 2009.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE